UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, et al., | ) ) ) | Cause No. |
| Plaintiff, | ) ) | 1:14-CV-02047-TWP-DML Indianapolis, Indiana |
| vs. | ) ) | **December 19, 2014** 9:24 a.m. |
| FRANKLIN COUNTY, INDIANA, | ) ) | |
| Defendant. | ) | |

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
MOTION FOR PRELIMINARY INJUNCTION


**For Plaintiffs:**          Gavin Minor Rose, Esq.
                            ACLU of Indiana
                            1031 East Washington Street
                            Indianapolis, IN  46202


**For Defendant:**           John O. Worth, Esq.
                            Worth Law Office
                            136 East Second Street
                            P.O. Box 309
                            Rushville, IN  46173-0309

                            Peter Breen, Esq.
                            Jocelyn Floyd, Esq.
                            Thomas More Society
                            Suite 603
                            19 South LaSalle Street
                            Chicago, IL  60603

Court Reporter:             David W. Moxley, RMR, CRR, CMRS
                            United States District Court
                            46 East Ohio Street, Room 340
                            Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1                    (In open court.)

2         THE COURT:  Good morning, everyone.  We are on the

3    record, and this is Freedom From Religion Foundation, Inc.,

4    Steve Kristoff, and Renana Gross, plaintiffs, versus Franklin

5    County, Indiana.  Our case number is 1:14-cv-2047.

6              And, Counsel, why don't we begin by having you state

7    your names for the record and introducing those at your table

8    for the defendants.

9              MR. ROSE:  Good morning, Judge.  Gavin Rose for the

10   plaintiffs.

11        THE COURT:  Good morning, Mr. Rose.

12        MR. WORTH:  Your Honor, I'm John Worth, county

13   attorney and attorney for the county commissioners.  And with

14   me is Peter Breen and Jocelyn Floyd from Chicago.

15        THE COURT:  Okay.  Good morning.  All right.  And

16   we're here for a hearing on a preliminary injunction.  And

17   before we get to that, we have some housekeeping matters to

18   take care of.  First of all, Ms. Floyd and Mr. Breen, have you

19   been able to upload your petition for pro hac vice?

20        MS. FLOYD:  Your Honor, I e-mailed it to Mr. Worth's

21   office to file it and then I turned all my electronics off, so

22   I haven't received confirmation.  I can turn my phone back on

23   and verify if you would like.

24        THE COURT:  Okay.  We can -- it's not on the docket.

25   The Court will allow all parties to turn on their electronics,

1  the attorneys.  So, first of all, that request will be

2  granted.

3          And the Court can allow you all to appear

4  provisionally if you inform the Court, Ms. Floyd, that you

5  have attempted to get everything docketed electronically.

6  And, hopefully, it will be on the docket shortly.  Is that

7  correct?

8          MS. FLOYD:  That is correct, Your Honor.

9          THE COURT:  All right.  So the Court will allow --

10  do you have any objection to that, Mr. Rose?

11          MR. ROSE:  No, Judge.

12          THE COURT:  Okay.  The Court will allow Ms. Floyd

13  and Mr. Breen to appear provisionally.  And we anticipate that

14  we'll have your paperwork shortly.

15          Okay, we're set for hearing.  And just a few moments

16  ago, defendants filed a motion to reset the preliminary

17  injunction hearing date and/or strike plaintiff's affidavits.

18  Who is going to be lead counsel?

19          Mr. Breen, why don't you come up to the lectern and

20  let's talk about that motion first.

21          MR. BREEN:  And I believe I'm supposed to be on both

22  microphones or how does that --

23          THE COURT:  Does he need both?

24          MR. BREEN:  Okay.  All right.  Thank you.

25          THE COURT:  We have lots of rules in the Southern

4

1 District of Indiana.

2          MR. BREEN:  Thank you.  And you have a much better

3 looking courthouses than we have up in Chicago.

4          THE COURT:  Well, thank you.  So, Mr. Breen, you're

5 with the Thomas More Society?

6          MR. BREEN:  Yes, Your Honor.  We are a public

7 interest law firm in Chicago, representing the Franklin County

8 unit of government pro bono on this particular matter.

9          I apologize for my appearance because we were

10 engaged yesterday afternoon due to our involvement with

11 nativity scenes and First Amendment issues, and so I had --

12 both my co-counsel and I had hoped to get up here, get here to

13 Indianapolis more quickly, but 65 south was shut down.  So I

14 literally got in about a little before 3:00 this morning, and

15 I have not slept.  So, again, I apologize if maybe we had a

16 typo or two in this motion.  And anything else that I may say

17 today, I apologize if I speak a little jumbled or out of turn.

18 I just apologize in advance for that.

19          THE COURT:  Apology accepted.  And the Court

20 understands.

21          MR. BREEN:  Thank you.  And thank for hearing this

22 motion.  The real issue here is, as we come into this case, we

23 don't see the reason for the exceptional speed that has been

24 imposed on this by the plaintiffs.  They've had, to some

25 extent, have had 50 years to bring a challenge to this

1  particular nativity scene.  One of the plaintiffs had 23

2  years.  He testified in his affidavit that it's been there

3  every year, his wife seven years.

4          Freedom From Religion Foundation itself has

5  identified this as allegedly a problem nativity scene as far

6  back as what, five Christmases ago, back in 2010.

7          And, as well, as we started looking at things, you

8  know, the standard notice for a preliminary injunction hearing

9  is 14 days.  It certainly can be shortened by the Court, but

10  only on good grounds and really serious reasons.

11          And I might -- when I looked at that complaint and

12  it said, my goodness, the County itself had put up nativity

13  scenes, I understand why the Court would be looking at that

14  and going, "Exactly what are you doing there?"

15          But once the actual facts, as I understand them,

16  have come out, this is a private nativity scene, similar to

17  many others in many other state capitols across the country.

18  In those other capitols, I think we cited in our motion that

19  the Freedom From Religion Foundation has actually posted their

20  own displays, taken advantage of the public fora, and been

21  able to express themselves.

22          For whatever reason, they have come into Franklin

23  County, though, and they are attempting to silence all

24  religious displays in this public forum.  We would suggest

25  that the better course of action is for them to seek to bring

1  forth their own display to -- you know, again, the solution,

2  as we look at it, is if you don't like a particular type of

3  speech, the solution is more speech.  It is not to squelch the

4  speech.

5        And, of course, in these cases, we have to be even

6  more careful, because you've got the First Amendment free

7  speech rights of private individuals who have sought

8  permission to place a private display in a public forum, and

9  those folks were given permission.  To our understanding of

10  the facts, no group has ever been denied permission to the

11  recollection of these commissioners, and they go pretty far

12  back in Franklin County.

13        And, again, discovery may bring up something

14  different, but at least as best as we can tell today, the

15  County allows anyone and everyone to be there on that, you

16  know, that public stretch of property.  It's a lawn.

17        I believe even in the complaint, it was alleged that

18  the Freedom From Religion Foundation complained about the

19  location of the nativity scene in 2010, and the County moved

20  it in 2011 to try -- and put up some string of lights and what

21  have you.  And so that -- even they were -- at least it

22  appears to me, looking at it from an outsider, that they were

23  trying to accommodate the folks at the Freedom From Religion

24  Foundation and not to violate or to, in any way, appear to be

25  endorsing this display.

1          It's also my understanding, and I'll have to defer

2   to my co-counsel, that even now, there's erected a sign?  Is

3   that correct, or about to?

4          MR. WORTH:  That's what we heard.

5          MR. BREEN:  Okay.  I believe there's a sign that's

6   either to be erected or been erected, and I'll have to get a

7   picture of that.

8          THE COURT:  By whom?

9          MR. BREEN:  By the county, to state, "This is not

10  us."  This is a private display, not in public funds.  And as

11  a legal position, I don't believe that that was necessary to

12  avoid the Constitutional arguments here, but it is yet another

13  show of, I almost would say, gilding the lily, that this

14  county is not attempting to violate the Establishment Clause

15  of the First Amendment, but merely to uphold the free speech

16  clause.

17         And then, Your Honor, more the reason for this

18  motion was, I am standing here and not quite able to give you

19  perfect answers as to these facts, because I have not been

20  able to consult with my clients.  And I do believe that the

21  facts alleged in this complaint are not what they appear on

22  the ground.  Now, I was -- when we talked in, I did get a

23  77-page deposition transcript, which --

24         THE COURT:  You have not read yet?

25         MR. BREEN:  -- I have not read yet.  And that is

1 from my 30(b)(6) witness, that I would like to see and make

2 sure that what I understand him to have told me is what he put

3 on the record.  But, if it is anywhere close, this is a much

4 different case than what was presented in that complaint.

5        And it's one that it's -- as best I can tell, Your

6 Honor, this is the standard Constitutional and very much

7 standard across the country private display on a public forum,

8 again, where it's open for anyone.

9        You know, in the state of Illinois, the state

10 capitol, in the middle of the rotunda, there stands a nativity

11 scene, the middle of the rotunda.  It was moved there by the

12 secretary of state, and that's in the Seventh Circuit.

13 There's been no challenge.  In fact, you know, we've been

14 joined by the ACLU of Illinois in supporting that particular

15 display.

16        And I really -- I guess I would hope that once the

17 facts come out, that the ACLU of Indiana will support this

18 display in Franklin County, as well, as being a private

19 display on public property.

20        And what happened in these other state capitols, the

21 Freedom From Religion Foundation comes in, they put up their

22 display.  One year in Illinois, someone put up a festivous

23 pole, which is a -- it's kind of a fake -- it was a made-up

24 thing, but they said, "Well, look, we'll make space for you

25 because this is a free -- this is a free speech zone."

9

1          And, Your Honor, I laid out some of the -- I don't

2    mean to belabor the point, but we're talking about a county

3    with less than 25,000 people.  So they don't necessarily have

4    all of the most sophisticated Constitutional law provisions in

5    their codes.  But, from what I can tell, no one has been

6    denied their First Amendment right to free speech.  It is a

7    public forum that has been designated by this county, and so

8    it is open to all.  Now --

9          THE COURT:  Now, we're talking about your motion for

10   continuance.

11         MR. BREEN:  And, yes, Your Honor --

12         THE COURT:  And I assume, Mr. Breen, that you and

13   Ms. Floyd do these types of matters routinely --

14         MR. BREEN:  Well --

15         THE COURT:  -- probably every Christmas season?

16         MR. BREEN:  Well, actually, Your Honor, we have not

17   had too much trouble.  Again, normally, we are -- we are able

18   to get cooperation.  And, to some extent, we were surprised

19   because of the timing of this lawsuit.  Usually we -- if

20   there's an issue, it's discussed back before Thanksgiving.  We

21   get these things worked out.  If there are accommodations that

22   need to be made, then they're made before coming to court.

23         And certainly coming to court with a complaint nine

24   days before Christmas, getting served with it eight days

25   before Christmas, and trying to come in on a preliminary

1  injunction hearing six days before Christmas -- and I guess I

2  might point out, too, the only -- if you don't believe in

3  Christmas, the significance of the timing to Christmas really

4  only matters if you are in support of the nativity scene.

5  Otherwise, there's really no hurry on this, other than the

6  usual.

7        I just -- I put these facts to the Court, or at

8  least my understanding of them, to say this is -- this appears

9  to me to be a relatively run-of-the-mill nativity scene.  And

10  maybe it's bigger than usual, maybe there are some other

11  factors here that we need to look at, but it's not the sort of

12  a slam dunk violation of the Establishment Clause, and

13  probably is actually the other way.  And I'll contend that on

14  behalf of my client as I continue to develop the facts.  But

15  it's certainly not something to rush through.

16        If it is what the ACLU says it is, and a violation

17  of the Establishment Clause, it is a very close case at best

18  for them.  And if the facts bear out as I believe they do,

19  then it would really be a free speech case.  And in that case,

20  the public forum doctrine prevails, in our understanding of

21  it.

22        THE COURT:  Okay.

23        MR. BREEN:  And, Your Honor, again, yesterday we had

24  additional affidavits.  That's a violation of Rule 6.  If you

25  want to put affidavits in in support of your motion, you've

1  got to bring them in with the motion.  That can, of course, be

2  waived by the Court, but when there's prejudice to the other

3  side, to the nonmovant, you know, that's not the sort of thing

4  we can do, particularly when you -- I mean, I don't know how

5  long they've been developing this complaint.  I just -- you

6  know, I got it on short notice.

7             THE COURT:  Okay.

8             MR. BREEN:  So --

9             THE COURT:  All right.  Let me hear from

10 Mr. Gavin --

11            MR. BREEN:  Thank you, Your Honor.

12            THE COURT:  Mr. Rose.  I'm sorry.  And see what his

13 position is.

14            MR. ROSE:  Judge, obviously, a significant portion

15 of that was legal argument on the merits, as well as facts

16 that do not appear in the record.  And I'm prepared to address

17 that when we actually get to the preliminary injunction

18 request.

19            The Freedom From Religion Foundation has contacted

20 the County every year since 2010 with one exception, in 2012.

21 It's surprising that the County is finally surprised by this.

22 The fact of the matter is that my first contact with my client

23 came last Friday.  Research on the complaint was done Monday

24 or Tuesday.  A brief was prepared and filed the same day.  The

25 affidavits were prepared and filed the second we had them.

1           As far as I'm concerned, the affidavits from my

2     clients cannot possibly be subject to reasonable dispute, from

3     our perspective.  The only purpose they serve is to -- is to

4     ensure that standing is present and to authenticate the

5     pictures of the actual exhibit, which is what it is, and is

6     not subject to reasonable dispute.

7           Obviously, affidavits are admissible on preliminary

8     injunction.  I think I could have shown up here and asked the

9     Court to admit them into evidence, and that would have been

10    permissible.  I made sure the County had them as soon as I had

11    them.  And the same with the deposition transcript, which was

12    filed as soon as possible.  The fact of the matter is that

13    this display is only up for a month every year.  Whenever this

14    case was going to get filed, it was going to require a prompt

15    resolution.

16          I do acknowledge that the facts in discovery are

17    slightly different than were alleged in the complaint.

18    Mr. Worth and I both had the pleasure of sitting down at a

19    30(b)(6) deposition yesterday.  I am prepared to summarize

20    those facts in as neutral a manner for the Court as possible,

21    and I'm sure Mr. Worth can tell his co-counsel if I have

22    misstepped.  I do not think it's a close case.  I think it's a

23    case virtually identical to a case that Judge Barker decided

24    last year.

25          THE COURT:  Okay.  Mr. Rose, you all met with the

 1  magistrate judge yesterday, is that correct?

 2          MR. ROSE:  We spoke with Judge Lynch yesterday.  I

 3  sat down with Mr. Worth.  At no point was a request to

 4  continue or any objection made to our affidavits lodged.

 5          THE COURT:  And, in fact, Mr. Worth indicated, did

 6  he not, that he would be ready today?

 7          MR. ROSE:  That's my understanding.

 8          THE COURT:  That's what the magistrate judge has

 9  relayed to the Court, because the Court was -- you know, if we

10  needed to wiggle around, even though half of my staff wouldn't

11  be here, I'm here the full term.  I'm not taking off for

12  Christmas, and we could have moved it to Monday, but we're

13  here now.  The lawyers are here from Chicago.  You know, if

14  you -- do you feel prepared to proceed?

15          MR. ROSE:  I am certainly prepared, Judge.

16          THE COURT:  And, Mr. Breen, can you be prepared to

17  proceed this morning or do you want to -- you know, what I

18  could do, lawyers, is we could move it back in the day, later

19  today, since you didn't get here till 3:00 a.m.

20          MR. BREEN:  Well, Your Honor, I would say I would --

21  if you could move us to Monday, I would much rather at least

22  have a chance to look at this and sleep and be able to come in

23  on Monday and give you a coherent argument and be able to

24  address -- I mean, if you look -- this is a distinguished

25  fellow member of the bar.  We've worked in parallel on certain

1  cases.  We've never had the opportunity to meet each other.

2          We might be able to come up with something over this

3  weekend that could maybe get these parties to some

4  understanding, at least, or clarify stipulations or do

5  something to make this a little more cognizable, because if

6  it's a clear case on your side, I will grant you that point.

7  If it's a clear case on my side, I hope you would do the same.

8  If it's a tough case, then we can come and we can give you the

9  best argument we possibly can, Your Honor.

10          I just -- I don't mind coming back on Monday,

11  because that -- if you're in Indianapolis and Your Honor is

12  here and available, I would just very much appreciate that.

13          THE COURT:  Or, Mr. Rose, you could go on and do

14  your presentation today, and then we can allow Franklin County

15  to come back on Monday.

16          MR. ROSE:  Or if it would make --

17          THE COURT:  Or we could move it to 3:00 p.m. today.

18          MR. ROSE:  I was going to recommend or we could

19  proceed with oral argument today, and if the County wants to

20  file a post hearing brief or something like that --

21          THE COURT:  You could have until Monday to do that.

22          MR. ROSE:  That would save them the second trip

23  down, too.

24          MR. BREEN:  Okay.  I just -- I do need to review

25  this transcript, Your Honor, because that is something that is

1  really -- I want to make sure I know -- I mean, this is our

2  30(b)(6).  I mean, these are our -- this is our admissions,

3  really, and so I just would --

4       THE COURT:  Okay.  Well --

5       MR. BREEN:  I would like an opportunity to review

6  that.

7       THE COURT:  All right.  Well, we can do that.  How

8  long -- because there's no live witnesses, it's just argument,

9  correct?

10      MR. BREEN:  Apparently, that was agreed to

11 yesterday.

12      THE COURT:  All right.  And your argument will be

13 how long?  About --

14      MR. ROSE:  Less than half an hour, and only that

15 long because I am prepared to go more in-depth into the facts

16 because I know the Court has not had the transcript for any

17 longer than counsel.

18      THE COURT:  Okay.  Why don't we let Mr. Rose make

19 his presentation now, and then we'll take a recess and give

20 you an opportunity to talk with your client, review the

21 transcript, and then we'll come back in here.  I just have to

22 go to a luncheon at 11:45.

23      MR. BREEN:  And, Your Honor, I hate to impose, but

24 at the same time, I know if we're going to go on a preliminary

25 injunction, I would like to get an answer on file, just so

1   that I have that to rely upon or at least to not concede every

2   point in the complaint.  I mean, we have been drafting drafts,

3   but, again, we're -- I mean, if you will -- if you want to

4   argue and we can take a recess, and we will try to put

5   something together and get to you all, I would very much

6   appreciate that.

7            MR. ROSE:  We're not relying on the factual

8   allegations in the complaint.  We're relying on the affidavits

9   and the depositions.  So if you feel a need to, that's fine,

10  but --

11           MR. BREEN:  To make my record, I would very much

12  appreciate it.

13           THE COURT:  That will be fine.  And it may help you

14  if we hear -- if you hear right now what Mr. Rose has to say,

15  because he will, I'm sure, give an accurate representation of

16  what the testimony was in the deposition.

17           MR. ROSE:  I will certainly do my best.

18           THE COURT:  Okay.

19           MR. ROSE:  If I may have the Court's permission to

20  return to my table to my notes?

21           THE COURT:  You may.  You may.

22           MR. ROSE:  Thank you, Your Honor, and counsel.

23           As I just indicated, I am perfectly aware that the

24  Court and counsel have only received some of the evidentiary

25  filings this morning, so I would like to go more in-depth into

1  the facts and do as good a job at presenting them neutrally as

2  my clients would let me than I maybe normally would on a

3  motion such as this.

4           THE COURT:  That will be fine, Counsel.

5           MR. ROSE:  May it please the Court, for the past

6  half century, a life-size nativity scene has been erected on

7  the lawn outside the Franklin County Courthouse in Brookville,

8  Indiana.  The nativity scene consists, of course, of the baby

9  Jesus, Mary and Joseph, and several other figures appropriate

10  to the story of the birth of Christ.  Its religious

11  significance, of course, is undeniable.

12           This display is owned and stored by the Town of

13  Brookville, although it is erected each year by and at the

14  behest of a group of private individuals led by an individual

15  whose name appears in the record as Wayne Monroe.  The display

16  is lighted after dark so it is still visible to passersby.

17  And the electricity used to light the display is paid for by

18  the County.

19           Through 2010, the display was erected at the far end

20  of the lawn from the courthouse itself, surrounding a flag

21  pole in that location.  However, after being contacted from my

22  client -- by my client, the Freedom From Religion Foundation,

23  the display was moved to the portion of the lawn immediately

24  adjacent to the courthouse itself and alongside U.S. Highway

25  52.

1          THE COURT:  Mr. Rose, I'm sorry to interrupt you.
2   How do you know the display is owned by the town?  Was that in
3   the deposition?
4          MR. ROSE:  That was the county's deposition
5   testimony, yes.
6          THE COURT:  So they actually own it and they
7   actually store it every year?
8          MR. ROSE:  The town is a separate entity than the
9   County.  The Town of Brookville owns it and the commissioner,
10  at his deposition, indicated that he assumed that they stored
11  it during the year.
12         THE COURT:  Okay.
13         MR. ROSE:  So as far as we're aware, it's not owned
14  or stored by the County itself.
15         THE COURT:  So by the town.  All right.  Thank you.
16         MR. ROSE:  Given the location of this nativity
17  scene, it is visible to any person entering or exiting the
18  Franklin County Courthouse, and it is visible to countless
19  travelers, pedestrian or vehicular, that use what is Main
20  Street in Brookville, but U.S. Highway 52 elsewhere.
21         In recent years, in admitted recognition of the
22  potential that the display might be viewed as an endorsement
23  of religion, one of the county's three commissioners added
24  various secular items to the display.  The first year, I
25  believe this was 2010, lights were strung around a nearby

1   evergreen tree, that appeared on the courthouse lawn

2   year-round.  For a year or two after that, a series of six

3   plastic or wire reindeer were placed near the display.

4           In our complaint, we also described a sign that we

5   believed appeared in some of the photographs from past years.

6   Discovery has revealed that our interpretation of the

7   photograph was erroneous.  What we were looking at was a

8   gingerbread house, which was put up every year as a part of a

9   different event.

10          The County hosts a "November Noel," which consists

11  of carolers during one night, I assume in November.  The

12  gingerbread house is put up for a couple of days before that,

13  and then taken down after that event.  So the gingerbread

14  house is on or near the lawn for a couple of days, whereas the

15  nativity scene is there for a month.  And just by

16  happenstance, the photographs in the record were -- some of

17  them were taken during that two-day period.

18          THE COURT:  Okay.

19          MR. ROSE:  At the present time, however, as the

20  display is currently erected, there are absolutely no

21  countervailing images contained within the display.  There is

22  no gingerbread house, there is no reindeer, there is nothing

23  other than the creche itself as a part of the display.  The

24  reindeer, I believe, have been moved further down the lawn,

25  such that they're not part of the same display.  Nor as of the

1   30(b)(6) deposition yesterday was there any disclaimer

2   disclaiming the county's endorsement of the message, although

3   Counsel has indicated that that might be going up this

4   weekend.

5          In order to erect this display each year, a group of

6   private individuals, a group of private individuals led by

7   Mr. Monroe, follows an unwritten procedure that is available

8   to persons wishing to put up a display on county property,

9   including the courthouse lawn, or at least those persons who

10  somehow become aware of this unwritten procedure.  Permission

11  is requested of the county commissioners at a public meeting.

12  And if a majority of the commissioners approve, the display

13  may go up.

14         After the first year the display is approved, if the

15  display is approved, the County indicated in its Rule 30(b)(6)

16  deposition that the commissioners no longer need a formal

17  motion or a formal vote in order to approve the display, but

18  simply accept at a public meeting that the display may be

19  erected again.  However, there is some doubt as to whether

20  this last portion of the unwritten procedure is uniformly

21  followed.

22         While it is clear that this sort of tacit approval

23  is given to the nativity scene at issue in this case, the

24  meeting minutes that we filed this morning as document 13-2, I

25  believe, reflect that the only other two displays erected on

1  the courthouse lawn, something called a clothesline project

2  and something called Pinwheels for Prevention, both of which

3  are put up in the springtime.  Even though those have been

4  going up for multiple years, the commissioners still do make a

5  formal motion and formally vote on approval for those

6  displays.

7        By contrast, the minutes for the November 12th,

8  2013, meeting, where the nativity scene was discussed,

9  indicate only that Mr. Monroe stood up before the

10 commissioners and said that the nativity scene, "will be

11 placed on the courthouse lawn."

12        Although the commissioners have never denied a

13 request to approve a display, they reserve the right to do so.

14 And their unwritten policy is that they will disapprove of any

15 display that is not, quote/unquote, in good taste or that

16 violates public decency.  At his 30(b)(6) deposition, one of

17 the commissioners confirmed what seems obvious, that the three

18 commissioners very well may differ as to what they believe is

19 in good taste.

20        He further indicated that while he would approve a

21 display put up by an atheist group consisting of a sign that

22 says there is no god, he would disapprove if the Ku Klux Klan

23 wanted to put up something to demonstrate their beliefs or if

24 the Church of Satan wanted to put up something to support

25 their beliefs.  He expressly stated that those would be in bad

1  taste and would not be approved.

2         He also would not approve any display that is

3  intended to be "anti-something."  You're allowed to support a

4  religion, but you're not allowed to be against that religion.

5  You're allowed to support a cause, but you can't be against

6  that cause.  As such, given this, it is clear that the

7  courthouse lawn has not been opened up as a public forum for

8  any and all unattended displays.

9         In fact, the County is aware of only two other

10 displays that have ever gone up on the courthouse lawn.  These

11 are the pinwheel display and the clothesline display, both of

12 which are put up to support various causes.  Each of these

13 displays, however, has only gone up for a handful of years, so

14 as far as the record reflects, for decades, the only display

15 on the courthouse lawn was this nativity scene, has been this

16 nativity scene.

17        The plaintiffs in this case are, of course, a

18 nonprofit organization advocating the separation of church and

19 state, as well as two individual members of that organization

20 who reside in the county and will come into contact with the

21 display and object to the display.

22        Even though the nativity scene is erected at the

23 behest of a private individual, its presence on the lawn does

24 violate the Establishment Clause.  All requirements for the

25 issuance of a preliminary injunction on that, and one should

1    issue.

2           The U.S. Supreme Court has twice now addressed

3    challenges under the Establishment Clause for displays of

4    nativity scenes on public property.  In *Lynch*, the Court

5    upheld the display in a public park that consisted of a

6    nativity scene along with numerous secular symbols of the

7    holiday season:  A Santa Claus house, candy striped poles, a

8    reindeer pulling a sleigh, Christmas tree lights, a banner

9    that read, generically, "Seasons Greetings."

10          THE COURT:  A whole lot of stuff?

11          MR. ROSE:  A whole lot of stuff.  This was

12   permissible, the Court held, because the presence of

13   additional secular messages was adequate to nullify the

14   religious import of the creche itself.  The display, as a

15   whole, was deprived of its religious significance.

16          By contrast, the Court more recently, in *Allegheny*

17   *County*, held unconstitutional a private organization's display

18   in a county courthouse of a nativity scene in -- even though

19   that scene was accompanied by several poinsettia plants, by a

20   Christmas tree, and even by a sign indicating that it was

21   donated by a private individual.  Unlike in *Lynch*, these

22   secular symbols were inadequate to deprive the display of its

23   religious significance, and it was held unconstitutional.

24          The photographs of the nativity scene at issue in

25   this case are, of course, in the record, and I don't think the

1   County can advance any argument that the display at issue here

2   is closer to *Lynch* than it is to *Allegheny County*.   There's

3   not even the tree that there was in *Allegheny County*.   There

4   are simply no nonreligious messages that are part of this

5   display.

6           Instead of attempting to justify the display as

7   somehow nonreligious, it is my understanding that the County

8   is taking the position that the display is permissible because

9   it has been erected by and at the behest of a private party on

10  the same terms that any other person could put up a similar

11  display.   And, therefore, the argument goes the display is

12  simply an exercise of that private individual's First

13  Amendment free speech rights.

14          I think that there is enough in the record to

15  question whether this is true or whether it's simply a post

16  hoc rationalization for the display.   I don't think it's

17  necessary for the Court to wade down that particular path,

18  however, because even if everything the County says is

19  100 percent true, the display is still unconstitutional.

20          This Court does not need to tread any new ground in

21  this area.   As I mentioned at the outset, Judge Barker dealt

22  with a virtually identical display -- not display.   Virtually

23  identical arguments last year in the *Cabral v. City of*

24  *Evansville* case that we cited to the Court, which is a case

25  with which I happen to be pretty familiar.   In *Cabral*, a

1   private church, or a conglomeration of churches it ended up

2   being, submitted a formal written application through a

3   process available to absolutely everyone in order to display a

4   series of Latin crosses on Evansville's popular riverfront.

5           Like here, no display had ever been requested and

6   denied.  That application was approved by the city, although

7   the city eventually went so far as to require that the church,

8   in putting up these crosses, erect large disclaimer signs on

9   either end of the display saying, "The city does not support

10  this."  Even this, however, was not enough for Judge Barker,

11  who rejected the precise arguments that I understand the

12  County to be making in this case.

13          Judge Barker held that the overtly religious

14  display -- and both displays are overtly religious -- even

15  when erected by a private person, placed away from the seat of

16  power, which this is not; and expressly disclaiming any

17  government endorsement, which is not the case so far as the

18  record reflects, but we're told that that -- the sign will go

19  up in the near future, but we don't know how big, where, or

20  the manner in which it will be visible to people driving down

21  Highway 52 at 40 miles an hour.  Even under those

22  circumstances, the display was held unconstitutional in the

23  *Cabral* case.

24          And the reason for this is that five justices in

25  *Capitol Square v. Pinette*, which we cited to the case -- to

1  the Court, rejected these arguments.  In their controlling

2  concurrences, and *Pinette* was a plurality decision where the

3  concurrences are controlling, Justice O'Connor and Justice

4  Souter both concluded that, "Because an unintended display,"

5  and I'm quoting here, "an unintended display and any message

6  it conveys can naturally be viewed as belonging to the owner

7  of the land on which it stands, the question is simply whether

8  a reasonable person viewing that display would conclude that

9  the government had endorsed religion."  The Seventh Circuit

10  reached an identical conclusion in the *City of Marshfield*

11  case.

12          That is clearly the case here.  Not only is the

13  nativity scene placed along a busy thoroughfare directly

14  adjacent to a seat of governmental power, but there's nothing

15  in the display from which a person might conclude that this is

16  somehow nonreligious.  This is *Allegheny County* once we get

17  into endorsement analysis.

18          The County has indicated that it attempts or

19  believes this to be an exercise of private persons' free

20  speech rights, but any reliance on the free speech clause is

21  simply misplaced.  Over the years, the Supreme Court has

22  repeatedly emphasized that whenever there is a perceived

23  conflict between the free speech clause and the Establishment

24  Clause, the Establishment Clause prevails.

25          In *Pinette* itself, in a portion of *Pinette* that

1  commanded the votes of five justices, and I think even seven

2  justices, the Court said that compliance with the

3  Establishment Clause is a state interest sufficiently

4  compelling to justify content-based restrictions on speech.

5  In *Good News Club* in 2001, the Court said that, "We have said

6  that a state interest in avoiding an Establishment Clause

7  violation may be characterized as compelling and therefore may

8  justify content-based restrictions."

9         In a case called *Burger* from 1993, the Seventh

10  Circuit noted that First Amendment jurisprudence is densely

11  populated with cases that subordinate free speech rights to

12  Establishment Clause concerns.

13         The only cases, and cases on which I assume the

14  County intends to rely, but the only cases that have found

15  impermissible content-based discrimination under the free

16  speech clause when religious organizations are not allowed to

17  exercise their rights on the same terms as everyone else are

18  cases in which the speech occurred in person.  These are cases

19  such as *Good News Club* or *Lamb's Chapel*, where what we're

20  talking about is a religious student group wishing to make use

21  of school facilities on the same conditions that are available

22  to every single other person, every single other group that

23  wants to make use of those facilities.

24         But the reason that a religious club has the same

25  rights as a nonreligious club in that particular circumstance

1    is that when the speaker is present, when there is a speaker

2    there, a nongovernmental speaker, delivering his or her

3    message, there's no likelihood that a reasonable observer is

4    going to see them speak and say, "This is the speech of the

5    government."  That's why the County cannot, and I assume does

6    not, prevent someone from standing on a street corner and

7    sermonizing.

8           Even though that person is on public property, no

9    one thinks that person is speaking on behalf of the

10   government.  The same with religious pamphleteers in a public

11   park.  Obviously, those don't violate the Establishment

12   Clause.

13          But there's a different rule of law when we're

14   talking about an unattended display, because as *Pinette* and

15   the *City of Marshfield* hold, when this is on public property,

16   this is something that is going to be attributed to the

17   government itself.  Again, Judge Barker made this very clear

18   in her decision in the *Cabral* case, and her holding stands on

19   solid legal footing.

20          I would hasten to add, also, that although the --

21   although the church's appeal in that case was dismissed for

22   lack of appellate standing, the Seventh Circuit did go out of

23   its way, in what is admittedly dicta, because they did not

24   have standing, to, quote/unquote, caution that the church's

25   road ahead might not get any easier if they ever attain

1  standing, because a reasonable observer viewing that, even

2  with the disclaimers, would not conclude that this is strictly

3  private speech.

4         Of course, Your Honor, as I noted at the outset,

5  this body of case law is the best-case scenario for the

6  County, and it is only applicable if the county's statement

7  that this is truly a public forum, open to absolutely

8  everyone, is not a post hoc rationalization.  However, as I

9  say, I think there is a significant amount of evidence in the

10 record to suggest that that's precisely what this is.

11        And I would add, the Court, the Supreme Court in

12 *McCreary County*, which concerned a Ten Commandments monument,

13 went out of its way to make clear that such post hoc

14 rationalizations, additions to history, are not permissible in

15 the endorsement analysis, because they simply hide the real

16 purpose of the display of the speech.  The issue in *McCreary*

17 *County* concerned a county's 11th-hour decision to add secular

18 items to a Ten Commandments monument.

19        But, as I say, there are numerous reasons to suspect

20 that what we're looking at here is a post hoc rationalization.

21 For one, the nativity scene has long played a special role at

22 the meetings of the county commissioners.  As I said, the

23 erection of the display does not even require a formal vote of

24 the commissioners in the same way that they vote on other

25 displays that go up on the courthouse lawn.

1          At least one county commissioner, and this is in the

2     deposition, as well, spoke in support of the nativity scene at

3     a rally recently held in order to maintain the nativity scene

4     at its present location.  The same commissioner, acknowledging

5     that the County was at least treading very close to the

6     Establishment Clause line, the same commissioner decided to

7     erect -- to put up lights around a nearby tree and to add

8     reindeer to the display.

9          Not only is that a recognition that there might have

10    been problems there, but the fact that a county commissioner

11    can go into a supposedly private display and just add in

12    materials -- add materials, add other messages to the display,

13    casts into doubt exactly how private that display ever would

14    be if the County can change the meaning of the display.

15         As I say, the County has absolutely nothing,

16    absolutely nothing in writing, concerning its supposed

17    unwritten policy of open access or of a person's rights to go

18    before the commissioners and request permission.  And even

19    these unwritten policies do not permit any display to be

20    erected.  They would not permit anything that is not in good

21    taste, defined to include the Ku Klux Klan if they want to

22    express their message, the Church of Satan if they want to

23    advance their religion, or any display that is anti-something

24    else.  If this truly were an open forum, then those policies

25    are obviously anathema to the First Amendment, to the free

1   speech clause of the First Amendment.

2           And, again, the County has been contacted since at

3   least 2010 concerning this display by my client.  Not until

4   the past week has any public statement been made saying that

5   everyone can come there.

6           So, as I say, I do think there are reasons to

7   believe that we might be dealing with a post hoc

8   rationalization, but there's no need to go that far.  *Pinette*

9   is clear, *the City of Marshfield* is clear.  Judge Barker was

10  certainly clear in the *Cabral* case, that even if the

11  courthouse lawn were genuinely an open forum to everyone, and

12  it's not; even if the erection of the space were subject to

13  formal written neutral criteria, and they're not; even if the

14  courthouse had a lengthy history of permitting similar

15  displays, such that when a new person wants to put something

16  up, the average person may not conclude that this is the

17  government, and there is no such history.

18          And even if the nativity scene contained a sign

19  disclaiming governmental endorsement, which as of present, at

20  least, it does not, the nativity scene would still be subject

21  to scrutiny under the endorsement analysis.  And the fact of

22  the matter is that, under that analysis, a person entering the

23  Franklin County Courthouse, a reasonable observer, will think

24  the exact same thing that a reasonable observer entering the

25  Allegheny County courthouse did.  And under that analysis, the

1  display is clearly unconstitutional.

2         We are likely to prevail on the merits of our

3  claims.  And given that, the other requirements for

4  preliminary injunction are also met; i.e., demonstrate a

5  Constitutional violation, an irreparable harm follows.  I'll

6  add, the display is also only going to be up until early

7  January, so, obviously, there is an additional amount of

8  irreparability here.

9         The County cannot complain that requiring it to

10 comply with the First Amendment is harmful in any way.  And,

11 obviously, upholding the constitution is in the public

12 interest.  We would further request that preliminary

13 injunction be issued without bond, as the County is facing no

14 monetary injury.  Thank you, Judge.

15        THE COURT:  Thank you, Mr. Rose.  Do you want a

16 recess, Counsel?

17        MR. BREEN:  Yes, Your Honor.

18        THE COURT:  All right.  The Court is going -- you

19 may have a seat.  I'm going to go ahead and clarify for the

20 record that the Court is denying the motion for continuance,

21 as well as the motion to strike Plaintiff's affidavits.  The

22 parties did meet with the magistrate judge yesterday, and at

23 that time Attorney Worth did indicate that the defendants

24 could be ready for the hearing.  It's very unfortunate what

25 happened with your travel last night, Mr. Breen and Ms. Floyd,

1  but the Court is going to recess, and we'll reconvene in about

2  what, 45 minutes?

3            MR. BREEN:  Okay.  And I apologize, Your Honor, if I

4  misstated any of that in my motion which I drafted.  So,

5  please let that fall on me.

6            THE COURT:  Apology accepted.  Okay, we're in

7  recess.  And so it's 10:00 now.  We'll reconvene at 10:45.

8            And we do have a room in the back if you all would

9  like a little private room.  Tanesa can open that up for you

10  and you can sit down and talk with your clients and your

11  co-counsels.  Okay.

12            THE COURTROOM DEPUTY:  All rise.

13            (Recess at 10:04, until 11:02.)

14            THE COURT:  We are back on the record, Freedom From

15  Religion Foundation, et al., vs. Franklin County, Indiana.

16  And we've just taken about a little over an hour for our

17  recess.  And, Mr. Breen, are you ready to proceed?

18            MR. BREEN:  Your Honor, I am, but I would very much

19  prefer to take you up on that offer of starting up again on

20  Monday.  I really would.

21            After consulting with the other two commissioners

22  who are here today, I would like the 30(b)(6) deponent to

23  review his deposition, if that's going to be what we've got

24  in, because there are some -- you know, I don't want to say

25  that they are -- they are not misstatements, but they are not

1  full with the understanding of the other two commissioners.

2  And I might add that's understandable in that we got this

3  30(b)(6) deposition notice at 7:00 p.m. the night before the

4  deposition was to occur.  And so there is certainly going to

5  be a little bit of inaccuracy in a 77-page deposition of a lay

6  commissioner.

7           THE COURT:  Who was the deponent?  One of the --

8  which commissioner?

9           MR. BREEN:  That was Mr. Scott McDonough.  And,

10 really, Your Honor, there are certain places where it could

11 have been a bit more complete.  And I think if what we're

12 trying to do is get it right, instead of rushing, if we're

13 trying to get it right, if you let me come back on Monday, I

14 can help get it right.

15          MR. ROSE:  Judge, the County could have selected

16 anyone to be their 30(b)(6) deponent.  They selected

17 Commissioner McDonough.  Mr. Worth cross-examined him.  His

18 testimony is what it is.

19          So far as reviewing the deposition, he waived

20 signature.  If he had requested signature, I could have -- I

21 could see a reason to give him a chance to review that, but

22 signature was waived.  His deposition is what it is.

23          As I say, it was our agreement from yesterday that

24 there would be no live testimony.  It sounds like what the

25 County wants is to come back on Monday after, not just our

agreement, but after I've presented my entire argument, and

put on live testimony after -- I certainly acknowledge that

they've come only recently to this case, but the record is

what it is.  And the county could have put forward anyone as a

30(b)(6) designate.  They chose him.  He was cross-examined.

His deposition stands on its own.

THE COURT:  Okay.

MR. BREEN:  And, Your Honor, I mean, again, the

realities of this case are an incredible rate of speed with

lay witnesses who are not experts in Constitutional law.  He

is one member of a three-person body.

And at the same time, I am very new to this case.

And having come in two days -- or having come to this case two

days after the complaint was filed, normally that would be

quick enough to get me up to speed.  Again, I don't understand

the rush, why we are in such a speed mode when we're realizing

new things.  And counsel made certain arguments, and I said,

"Oh, well, you know, that is an important detail now, isn't

it?"  That might not have been an important detail prior to

counsel bringing it up.

We -- you know, we have a difference of opinion

about a forum.  Is it a designated public forum or not?  And

while, you know, my distinguished opponent made certain

statements about the case law, I have some pretty good

arguments on the other side, that I would like to flesh out,

1  so as to get this to the right decision and not to the

2  expeditious one.  I mean, Your Honor, again, I --

3           THE COURT:  Mr. Breen, are you proposing to

4  designate another 30(b)(6) witness or are you -- what do you

5  want to do over the weekend?  You want to come in and do your

6  oral argument on Monday, but your learned counsel, co-counsel,

7  has already -- you know, he waived signature on this

8  deposition.  He indicated and agreed there would be no live

9  witnesses --

10          MR. BREEN:  And, Your Honor, I --

11          THE COURT:  -- so tell me, what do you want to --

12          MR. BREEN:  Well, here's -- and if I just -- made

13 just a slight point, at least the instruction to Mr. Worth,

14 his final instruction in this deposition was, "You have that

15 right either way."  So I don't know what Mr. McDonough

16 understood about his right to waive signature or not.  I'm not

17 sure.  And, again, this is so expedited, and it just -- you

18 know, and, Your Honor, if --

19          THE COURT:  Are you proposing to submit affidavits?

20 Tell me what you're proposing.

21          MR. BREEN:  You know, Your Honor, that actually

22 might make the most sense, because the plaintiff submitted

23 affidavits late, not with their motion.  And we didn't have

24 them until Thursday afternoon or evening, probably didn't have

25 time to review them prior to preparing the witness for this

1    30(b)(6) deposition.  I had not seen them until recently.

2            THE COURT:  When can you have -- if the Court allows

3    you to submit affidavits, when will you have those submitted?

4            MR. BREEN:  How about Sunday night?

5            THE COURT:  And then you would ask to reserve making

6    your argument until Monday morning?

7            MR. BREEN:  I'll come in Monday at whatever time

8    Your Honor can hear us.

9            THE COURT:  All right.  Mr. Rose, over your

10   objection, I'm going to grant a brief continuance.  Your

11   30(b)(6) report is what it is.  You know, he did waive

12   signature, so this -- and counsel has already based his entire

13   argument, which he's given to the Court, on this evidence, so

14   this is it.  If you want to submit affidavits, I assume from

15   the other commissioners, I'll allow you to do that.  And are

16   you going to submit your brief with your authority on Sunday

17   night, also?

18           MR. BREEN:  If that would --

19           THE COURT:  Is that good if you get it Sunday, or do

20   you want it --

21           MR. ROSE:  That's perfectly fine, Judge.  I am a

22   little concerned -- I'm a little concerned about affidavits

23   submitted without a chance to do discovery, especially if

24   they're going to be contradicting or augmenting a 30(b)(6)

25   deposition.

1        THE COURT:  Why don't we do the -- have the

2  affidavits by Saturday, then.  You're just going to have to do

3  it.  I know it's the holiday, but --

4        MR. BREEN:  Okay.  But --

5        THE COURT:  -- so that Mr. Rose can have them

6  docketed by -- what time do you want them on Saturday?

7        MR. ROSE:  Anytime Saturday is fine.

8        THE COURT:  Okay.

9        MR. ROSE:  But if new things are being said, I may

10  need to depose someone on Sunday.

11        MR. BREEN:  Well, why don't we exchange -- if --

12        MR. ROSE:  If there are just minor things, I don't

13  mind working with you to a stipulation, but if he's going to

14  contradict what was said or --

15        THE COURT:  Okay.  Why don't we -- we can set the

16  hearing at 11:00 a.m. on Monday.  And then, lady and

17  gentlemen, the lawyers can meet.  And if you need to take --

18  to do whatever, you can do that Monday morning --

19        MR. ROSE:  Sure.

20        THE COURT:  -- so that no one is taking statements

21  on Sunday.

22        MR. BREEN:  Yes, Your Honor.  Prior to the hearing,

23  we would take depositions or what have you if anything else

24  was necessary?

25        MR. ROSE:  I'm hopeful that it will not be, but,

1  yes.

2        THE COURT:  Right.  And that would be, Mr. Rose

3  would be allowed, based upon the affidavits that he's going to

4  receive on Saturday --

5        MR. ROSE:  Yes.

6        THE COURT:  -- then you would need to make your

7  witnesses, the affiants, available Monday morning at whatever

8  time you want them to be here.

9        MR. BREEN:  Sure.

10        THE COURT:  And you all can sit somewhere.  Do you

11  do -- let's go off the record for a minute.

12        (Off the record.)

13        THE COURT:  Well, you all can get someone, a court

14  reporter, and do that.  Where is your all's office?  Is it

15  located downtown?

16        MR. ROSE:  Yes, we can certainly do it at our

17  office.

18        THE COURT:  Okay.  You can meet at his office and

19  then come over to the courthouse.  I do have another matter at

20  9:00.  We'll do this hearing at 11:00 and allow you to give

21  your argument, Mr. Breen; and then, Mr. Rose, any -- you can

22  give your rebuttal.

23        MR. ROSE:  Sure.

24        THE COURT:  Okay?

25        MR. ROSE:  Thank you, Judge.

40

1          THE COURT:  All right.  So we'll have an entry

2   docketed shortly that will have all of those deadlines.

3          And did we ever get an appearance?

4          (Off the record.)

5          THE COURT:  Okay.  They've been approved, because we

6   do check to make sure you're allowed and in good standing in

7   your jurisdiction.

8          MR. BREEN:  Thank you.

9          THE COURT:  All right.  So you're official lawyers

10  on the case now.

11         MR. BREEN:  Thank you, Your Honor.

12         THE COURT:  All right, lawyers.  Okay, I'll see

13  everyone Monday morning at 11:00 a.m. for the continuation of

14  the hearing.

15         MR. ROSE:  Thank you very much.

16         MR. BREEN:  Thank you, Your Honor.

17         THE COURT:  All right.  We're adjourned for the day.

18         THE COURTROOM DEPUTY:  All rise.

19         (Proceedings adjourned at 11:12 a.m.)

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

1

2

3        I, David W. Moxley, hereby certify that the

4   foregoing is a true and correct transcript from

5   reported proceedings in the above-entitled matter.

6

7

8

9   /S/ David W. Moxley                January 30, 2015
    DAVID W. MOXLEY, RMR/CRR/CMRS
10  Official Court Reporter
    Southern District of Indiana
11  Indianapolis Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25